ADOLPH GOLDMARK & SONS, APPELLEE, v. SIMON BROTHERS
COMPANY, APPELLANT.

FILED JULY 9, 1923. No. 22388.

1. **Sales:** NONACCEPTANCE: RESALE: In the resale of goods which the
consignee unreasonably refuses to accept, the manner of sale is
within the reasonable discretion of the seller, and when made in
good faith and so as to produce a fair price for the goods, the
consignor cannot ordinarily be charged with negligence.

2. ———: INSTRUCTION: "MERCHANTABILITY." The court submitted
the following instruction: "The term 'merchantability' does not
require that the article shall be of first quality, but means that
the article shall be vendible upon the market in the ordinary
course of business and at the average price of such article, having
in view the kind of article referred to in the contract." The in-
struction conforms in all essential respects to the accepted rule as
applied to the term used. Error cannot be predicated upon the
fact that the jury were so instructed.

APPEAL from the district court for Douglas county:
WILLIAM A. REDICK, JUDGE. *Affirmed.*

*Arthur Rosenblum* and *Lambert, Shotwell & Shotwell,*
for appellant.

*Kennedy, Holland, De Lacy & McLaughlin,* contra.

Heard before MORRISSEY, C. J., LETTON and DEAN, JJ.,
BLACKLEDGE and COLBY, District Judges.

DEAN, J.

Plaintiff sold to defendant for delivery at Omaha a
car-load of Madagascar Lima beans, consisting of 40,000
pounds, at 12½ cents a pound f. o. b. New York. Upon
arrival of the shipment, defendant, alleging that the
beans were inferior to the quality which plaintiff con-
tracted to deliver, refused acceptance. Thereupon plain-
tiff, as alleged, "in order to mitigate the damages, retook
possession of the car and, after due notice to defendant,"
sold the shipment in small lots. The net receipts were
$1,927.31, after deducting $573.28 for expenses which it
was alleged were necessarily incident to the resale. The
net proceeds were applied to defendant's credit and this
action was brought to recover $2,666.69 with interest at

7 per cent. from January 1, 1920, that being the balance alleged to be due plaintiff at the contract price. A verdict was returned for plaintiff for $2,666.69 and $255.63 interest. After disallowing a few expense items, the court ordered that the verdict be reduced to $2,854.09, and rendered judgment in that amount for plaintiff. Defendant appeals.

The material part of the contract entered into by the parties follows:

"Contract for Madagascar Lima beans.   New York, Oct. 11, 1919.   Sold by Adolph Goldmark & Sons, Inc., to Simon Brothers Co., Omaha, Neb.

"Quantity, Article and Description.   Forty-thousand (40,000) pounds of Madagascar Lima beans, fair average quality, current crop, packed in bags of about 80 to 110 pounds each, seller's option.

"Shipment or Delivery.   October November shipment from Europe, or equivalent delivery.   No arrival no sale.

"Price and Terms.   Twelve and one half (12½) cents per lb., duty paid, f. o. b. New York, New York weights, gross for net.   Net cash, sight draft against B. L. Privilege inspection upon arrival. * * * Accepted, Adolph Goldmark & Sons, Inc."

Ralph W. Goldmark is the president of plaintiff corporation, its legal residence being in New York City. He testified that the words "privilege inspection upon arrival" were inserted in the contract upon the request of Mr. W. J. Simon who signed for defendant, and that they have a well-recognized meaning in the bean trade, which in effect is that the buyer has the privilege of examining the merchandise upon arrival to satisfy himself that the goods are in accordance with the contract of sale, and if they do conform thereto the buyer is obligated to accept the goods.   The secretary of the plaintiff corporation testified that his firm had dealt in and he had examined Madagascar Lima beans since 1913, and that the quality of the samples in question

was equal, if not superior, to the fair average quality of Madagascar Lima beans of the current 1919 crop.

Additional evidence was submitted by the parties on the question of quality and as to whether the shipment was merchantable. Three grain inspectors in the employ of the Omaha Grain Exchange took 50 samples of the beans at random out of the car January 2, 1920. For examination and report they gave one third of each sample to the Kohn Brothers Brokerage Company, of Omaha, and took the remainder to the Grain Exchange office, and sent about one third of the remaining samples to the New York Dried Fruit Association, where they were examined by a committee consisting of three disinterested members, appointed by the president, who were familiar with the trade. The evidence of one member of the committee was in substance that the samples were equal, if not superior, "to the fair average quality of Madagascar Lima beans of the crop which was current in October, 1919." The report of another was in effect that the beans were fully equal to, if not better than, the fair average quality of the 1919 crop, and, in the opinion of the third member, the sample was one of the best of the lots of the 1919 crop and above its fair average quality.

W. S. Frisbie, chief of the bureau of food products of Nebraska, testified that he made an examination from samples sent to the bureau for inspection and analysis, and that a laboratory chemist made an official inspection which he, the witness, saw, but that he did not make a record of his findings. He testified: "Q. Now, what would you say as to the percentage of infestation shown here, 6 and a fraction per cent., as an unusual amount of infestation for beans gathered from the field without being hand-picked? A. I wouldn't class that percentage as unusual. * * * Q. What per cent. of beans are usual to be infested as they come out of the field, do you know that? A. Why, yes; 5 per cent., anywhere around 5 or 6 per cent. is not at all unusual," and that

"there are some so called picked beans which will run that high." It appears that his evidence was based, not only upon his own experience, "but upon the past experience of the bureau of chemistry of the United States department of agriculture," that department having examined thousands of cases.

On the part of defendant Mr. Jake Simon, who is its general manager, testifed on the question of quality. He said that some of the bags "turned up as high as 20 to 25 per cent. bad," or what he would call worm infested; that he found no worms, but found beans with worm holes in them; that he "took a pile here, a pile there, and kind of estimated the piles of beans there were that was bad," and estimated that from 10 to 12 per cent. were bad, and that a blemished bean is one with a spot on it. He said he knew that in some years Madagascar Lima beans "run damaged."

A witness who was in defendant's employ when the consignment arrived testified that under Mr. Simon's direction he tested 15 or 20 bags and found no worms, but that he found "wormy" beans among them, but had no opinion as to the general condition of the ship-ment.

Some evidence was introduced on the part of de-fendant tending to prove that the beans were not merchantable, and that beans which showed that 6 11/12 per cent. were damaged could not be sold in the usual course of trade in Omaha except at a reduced price. The attention, however, of a witness on the part of de-fendant was directed to certain named grocery houses in Omaha, Sioux City, and Beatrice, to which consider-able quantities of the shipment were sold, and he testi-fied that they were reputable grocers and that they sold to a good class of trade. There was also evidence offered by defendant tending to prove that plaintiff, as an inducement to the contract, represented that the beans were equal to and larger than California beans,

but this was denied by plaintiff. This, among others, was a question of fact for the jury.

Defendant contends that the resales were not made within a reasonable time and that due diligence was not exercised to procure the best prices obtainable. Mr. H. L. Scott is a member of the Kohn Brokerage Company, and as such had charge of the resale of the shipment and his evidence was submitted to the jury. From this it appears that he made repeated sales in June, July, and August, 1920, to one of the leading grocery firms in Omaha, aggregating 9,488 pounds at 9 cents a pound, and that he sold quantities to grocers in Sioux City, Beatrice, Crawford, Deadwood, South Dakota, Pipestone, Minnesota, and to other concerns elsewhere, and that the purchasers were all reputable dealers selling to a good class of trade. With respect to the standing of the purchasers he was corroborated by other witnesses, at least one of whom appeared on the part of defendant. As tending to show diligence, the witness testified that he circularized the trade at considerable expense.

It appears that for the beans sold from June to August, inclusive, 9 cents a pound was realized, but in September the sale price was only 7 cents and 7½ cents, and finally the price fell to 4¼ cents on the last sales. He said that the market depression was caused in part by competition with the California product. Mr. Scott also testified concerning other sales, and a conditional offer from Chicago, at 10 cents for the entire lot, less freight, which, under the circumstances, plaintiff was apparently justified in rejecting. Anyhow, it was not a question of law for the court, but was a question of fact for the jury. From all the evidence we conclude that, in respect of making sales and obtaining as good prices as the circumstances of a falling market permitted, and with respect to the standing of the purchasers, the jury were justified in finding that plaintiff exercised reasonable diligence.

The rule is that, in the resale of goods which the consignee unreasonably refuses to accept, the manner of sale is within the reasonable discretion of the seller, and when made in good faith and so as to produce a fair price for the goods, the consignor cannot ordinarily be charged with negligence. 35 Cyc. 523, and cases cited.

A large part of defendant's argument is devoted to the proposition that the beans were not of a merchantable quality, and exceptions were taken to instructions given by the court on this and other submitted questions. The fact that the shipment was sold in separate parcels to five or six dealers whose trade consisted of a good class of customers appears to answer the argument of defendant. And to one of the largest dealers in Omaha sales were repeatedly made. On this point the court properly instructed the jury that by the contract "plaintiff impliedly warranted that the beans should be fit for human food and merchantable in character, and if you believe from the evidence that they failed to comply with either of these requirements you should find for defendant."

The court further instructed the jury: "The term 'merchantable' does not require that the article shall be of first quality, but means that the article shall be vendible upon the market in the ordinary course of business and at the average price of such article, having in view the kind of article referred to in the contract, and, therefore, if you find from a preponderance of the evidence that the beans in question were Madagascar Lima beans, fair average quality, current crop, as provided in the contract, and you further find from the evidence that they were merchantable as above defined, and fit for human consumption, your verdict should be for the plaintiff."

We think the instruction conforms in all essential respects to the accepted rule as applied to the term "merchantable." In *Warner v. Arctic Ice Co.*, 74 Me. 475, it was held: "While the purchaser without special

warranty cannot insist that the article should be of any, especially, particularly, good, quality, there would be an implied warranty on the part of the seller that it is of fairly merchantable quality." In the same case the court submitted this question for special finding to the jury: " 'Was or was not the ice on board these vessels, fair, merchantable ice for the market for which both the parties knew it was intended, when it was put on board at Woolwich?' And the jury answered, 'It was.' Exceptions being taken to the submission of this inquiry, held, no error."

"The word 'merchantable' in a contract, means generally vendible in market (2 Bouvier, Law Dictionary, p. 400); and, when unqualified in any way, such is its general meaning. It would be difficult, if not impossible to give an inflexible definition of the word 'merchantable.' Much in each case would depend on whether the article to be dealt in is susceptible to a fixed and uniform standard, or is of a variable nature, and is also dependent upon the conditions and circumstances surrounding each case." 5 Words and Phrases, 4490.

The case appears to have been fairly submitted to the jury under instructions in which error does not appear. The judgment of the district court is therefore

AFFIRMED.